**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MARCUS JOHNSON, ABRAHAM CHIU, CRYSTAL ALLEN, AND ANESSA GRAY**, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **THE ALLSTATE CORPORATION**, <br><br> Defendant. | Case No. 1:26-cv-2016 <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs, Marcus Johnson, Abraham Chiu, Crystal Allen, and Anessa Gray, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant The Allstate Corporation ("Defendant" or "Allstate"). Plaintiffs allege the following upon personal knowledge as to their own actions and upon information and belief as to all other matters:

**INTRODUCTION**

1. This case arises from an egregious privacy violation and breach of consumer trust in violation of Illinois, California, and federal laws. Defendant, a major insurance provider throughout the United States, assured insurance customers and other website visitors that their private information would remain confidential. When website users visit Defendant's website, www.allstate.com, Defendant displays a popup cookie consent banner. Defendant's cookie banner states that "[t]his website uses cookies . . . for advertising," but claims that visitors may "opt out of sharing your information for targeted advertising" by selecting the button labelled "Do not sell

1

or share my personal information."[1] Thus, Defendant purports to give insurance customers and other website users the option to opt-out of cookies and trackers used for the purpose of targeted advertising.

2.      The linked "More information" popup provides more detail on the types of cookies and trackers that Defendant claims will not be present if the visitor opts out. Defendant represents that "[a]ll website visitors, regardless of residency, can opt out . . . by selecting the 'Opt out of targeted online advertising' button."

3.      Contrary to the representations in its popup cookie consent banner and linked "More information" popup, Defendant embeds cookies and trackers, including cookies and trackers that share the contents of communications between class members and Defendant and visitor information for the purpose of "targeted advertising," on users' browsers, even after users explicitly decline consent via the cookie banner. Defendant's popup cookie banner contains false representations and gives insurance customers and other website users a false sense of security that their communications with Defendant and other actions on Defendant's website are not tracked. Even after website visitors decline consent, Defendant surreptitiously and illegally installs website tracking tools from third parties—including Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube (collectively the "Third Parties" and their "Trackers")—that track users' browsing activities and eavesdrop on users' private communications with Defendant for the purpose of profiting through serving targeted advertising.

---

[1] The banner appears immediately upon a consumer's first visit to Defendant's website. It is displayed prominently on top of all other content on the site, and persists onscreen until the consumer clicks "Continue," "Do not sell or share my personal information," or "More information."

4.    Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube are fundamentally data brokers and advertising companies. These companies collect personal data about individual consumers as the consumers navigate the Internet, which can be used to build individualized profiles about each consumer's interests for targeted advertising.[2] Defendant harmed its customers and other website users by sharing sensitive and private information with undisclosed Third Parties such as Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube even after Defendant explicitly promised it would not share information with advertising partners. Unbeknownst to website visitors, the Third-Party companies intercept the private information consumers share with Defendant for the purpose of selling interest-based targeted advertising.

5.    The Third-Party Trackers installed by Defendant enable the Third Parties to lurk unknown in the background, silently capturing the information visitors share with Defendant via its website even after the Defendant expressly promised it would not allow this.

6.    By means of the Trackers, the Third Parties intercept, store, use, and re-sell private information gleaned from visitors' interactions with the site. The information Defendant allowed and enabled Third Parties to intercept includes financial information that Defendant solicited from visitors who used the website to shop for and/or purchase insurance products. For example, when a visitor uses the website to apply for renter's insurance or home insurance, Defendant shares with Third Parties at least the following information, which Defendant solicits as part of the application process: (1) the applicant's first name; (2) the applicant's last name; (3) the type of insurance the

---

[2] More than 80% of Google's revenue, for example, comes from Google's ads business, which generated nearly $150 Billion for the company in 2020 alone. *See* https://www.cnbc.com/2021/05/18/how-does-google-make-money-advertising-business-breakdown-.html (last visited Jan. 17, 2026).

applicant is seeking (e.g., "Renters"); and (4) the applicant's "postalCode" and "state." Similarly, when a visitor uses the website to apply for auto insurance, Defendant shares with Third Parties at least the following information, which again Defendant solicits as part of the application process: (1) the applicant's first name; (2) the applicant's last name; (3) the type of insurance the applicant is seeking ("Auto"); (4) the applicant's "postalCode" and "state"; (5) whether the applicant is the primary insured; (6) the age of the applicant; (7) whether the applicant had prior accidents; (8) whether the applicant is a defensive driver; (9) whether the applicant is in the military; and (10) asset details about the applicant's car, including whether the applicant rents or owns, and the year, make, and model of the vehicle.

7.     By knowingly deploying these tracking technologies in violation of its own express assurances and without consumer's consent, Defendant violated fundamental expectations of privacy and several state and federal laws, including the Illinois Eavesdropping Statute (720 Ill. Comp. Stats. 5/14 *et seq.*), the Federal Wiretap Act (18 U.S.C. § 2511) and the California Invasion of Privacy Act ("CIPA"). Plaintiffs bring this action to hold Defendant accountable for its unlawful wiretapping and its deceptive practices that left consumers exposed – without warning, without choice, and without recourse.

8.     As a result of Defendant's conduct, Plaintiffs and Class Members have suffered injuries-in-fact and damages as detailed herein, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of private information; (iv) statutory damages; (v) continued and ongoing risks to their private information; and (vi) the potential for higher insurance rates or denial of insurance coverage.

9.     A tracker (also referred to as "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions. When a

4

person visits a website with a tracker, it tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[3] Then, the tracker transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[4]

10.     This type of tracking and data sharing is exactly what the consumers who declined consent via Defendant's cookie banner sought to avoid. Defendant falsely told insurance applicants that it respected their privacy and that they could avoid tracking and data sharing when they used the Defendant's website to shop for insurance products. Despite receiving notice of consumers' express declination of consent, Defendant defied their expressed wishes and breached the contractual duties created by its cookie banner and privacy policy. Defendant thereby violated Illinois, California and Federal statutory law, tort duties, and breached its contractual duties.

11.     Defendant sold out its customers' and website users' trust for a simple reason: money. On information and belief, Defendant allowed Third Parties to track its customers' and website users' browsing activity in part because doing so enables Defendant to more effectively advertise its own products on other websites, thus earning sales revenue. Defendant's online advertising efforts become more effective when they allow Third Party advertising platforms like Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube to intercept customer's online communications and bundle this information with other information the platforms collected while the consumer browsed other sites. If a consumer navigates to ameritas.com to explore insurance but ultimately does not make a purchase, they might then see

---

[3] *See Conversion Tracking*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[4] *Id.*

ads for Ameritas on other websites. These "retargeting" ads are possible because Ameritas allowed the advertising platforms to silently observe what the consumer did while on Ameritas' website.

## THE PARTIES

12.    Plaintiff Marcus Johnson is a natural person and a citizen of California, where he intends to remain. Plaintiff Johnson resides in Oakland, California. Plaintiff Johnson is a user of Defendant's website and used Defendant's website to search and apply for renters and car insurance. Plaintiff Johnson is a victim of Defendant's unauthorized disclosure of his information to Third Parties, despite Defendant's contractual promises in its cookie banner and privacy policy not to do so.

13.    Plaintiff Abraham Chiu is a natural person and a citizen of California, where he intends to remain. Plaintiff Chiu resides in San Bruno, California. Plaintiff Chiu is a user of Defendant's website and used Defendant's website to search for and apply for car insurance. Plaintiff Chiu is a victim of Defendant's unauthorized disclosure of his information to Third Parties, despite Defendant's contractual promises in its cookie banner and privacy policy not to do so.

14.    Plaintiff Crystal Allen is a natural person and a citizen of Illinois, where she intends to remain. Plaintiff Allen resides in Madison County, Illinois. Plaintiff Allen is a user of Defendant's website and used Defendant's website to search and apply for insurance. Plaintiff Allen is a victim of Defendant's unauthorized disclosure of her information to Third Parties, despite Defendant's contractual promises in its cookie banner and privacy policy not to do so.

15.    Plaintiff Anessa Gray is a natural person and a citizen of Illinois, where she intends to remain. Plaintiff Gray resides in Collinsville, Illinois. Plaintiff Gray is a user of Defendant's website and used Defendant's website to search and apply for automobile and homeowner's

6

insurance. Plaintiff Gray is a victim of Defendant's unauthorized disclosure of her information to Third Parties, despite Defendant's contractual promises in its cookie banner and privacy policy not to do so.

16.    Defendant The Allstate Corporation is a major insurance provider in Illinois and throughout the country. Defendant is headquartered in Northbrook, Illinois.

## JURISDICTION AND VENUE

17.    This Court has personal jurisdiction over Defendant. Allstate is headquartered in this state and district. Personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this state, and committed tortious acts in this state. Allstate makes its website available to consumers in Illinois and nationwide, and it also encourages consumers in Illinois and throughout the country to shop for, obtain, and manage existing insurance products.

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case presents a federal question. Plaintiffs allege Defendant violated federal law, including the Federal Wiretap Act, 18 U.S.C. § 2511.

19.    Numerous plaintiffs reside in this State, visited Defendant's website in this state, purchased insurance products from Defendant while residing in this state, and were residents of this state when Defendant shared their personal information with Third Parties.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## COMMON FACTUAL ALLEGATIONS

I.   **Defendant's Website Collects Sensitive, Private Information from Insurance Customers and Website Users.**

21.     Defendant offers insurance products to consumers. Defendant markets multiple insurance products to consumers around the country via its website, including car, home, and renters' insurance.

22.     Defendant encourages prospective and existing customers to use its website, www.allstate.com. When website users arrive on Defendant's website, prominent large text prompts them to "get a quote in the blink of an eye." Below this text appears seven icons corresponding to the types of insurance Defendant offers on its website: "Auto," "Home," "Renters," "Condo," "Motorcycle," "ATV/off-road," and "Term life." Website visitors are prompted to "Select products to bundle & save" by selecting one or more of the seven icons. Visitors are them prompted to enter their zip codes and click "get a quote" for the insurance products they selected.

23.     Visitors are then presented with a series of webpages, or "flow," in which Allstate prompts visitors to enter a variety of personal information. Fields requested include: first name, last name, street address, and a variety of information related to the asset or assets the visitor is seeking to protect.

24.     Defendant's website also encourages existing customers to use the site to "File or track a[n insurance] claim" and to pay insurance premiums.

25.     Thus, Defendant's website encourages website users to enter sensitive and private information including: their first and last names; the types of assets they own and the corresponding insurance products they need; their zip codes and locations; the fact that they have

suffered a loss and need to file a corresponding claim; and the fact that they owe and pay premiums on an existing insurance products.

26.     Unbeknownst to website visitors, and in direct contravention of the representations in its popup cookie banner and privacy policy, Defendant immediately facilitates and enables the interception of this sensitive and private information by Third Parties, including Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube. The interception occurs because Defendant's website includes trackers and cookies that intercept visitors' communications with Defendant and share the contents of those communications with Third Parties. What's worse, Defendant facilitates and enables the interception of this sensitive and private information even if visitors explicitly direct Defendant not to do so via Defendant's illusory opt-out cookie banner.

27.     Before describing Defendant's cookie banner and the specific trackers and cookies that persist on its website even after visitors attempt to opt out, it is useful to discuss how trackers and cookies work in general.

## II.     How Cookies and Trackers Enable Third Parties to Surreptitiously Intercept Website Visitors' Identifying Information and Communications.

28.     Visiting a website involves a series of electronic communications between the visitor's browser and the website's servers. When a person visits a website like www.allstate.com, their browser initiates a series of web requests to Defendant's servers, requesting the webpage and associated resources. These are typically styled as HTTP "GET" requests. As the visitor's browser processes the webpage, additional requests may be triggered by scripts embedded within the webpage. These scripts are instructions sent by the webpage to the visitor's browser, which the visitor's browser then executes.

29.     A visitor's interactions with a website may also involve HTTP "POST" requests. In a typical POST request, the visitor's browser sends information to the website's server. For example, when a visitor to www.allstate.com follows the on-site flow prompting them to apply for an insurance quote, their browser sends a POST request to Defendant's web server containing the information they entered into the website, including their first and last name, zip code, and the specific assets they are seeking to insure (e.g., "auto" or "renters").

30.     "Trackers" are one type of script that may be embedded within a webpage delivered in response to a "GET" request. Trackers instruct a visitor's browser to send information about the visitor's browsing activity to the tracker's developer. Tracked browsing information may include words typed, links clicked, time spent on each page, and buttons clicked by the visitor. This browsing information is typically accompanied by one or more data points that uniquely identify the visitor, such as their IP address or a "cookie."

31.     "Cookies" are small text files sent by a website server to a visitor's browser and stored locally on the visitor's device. Typically, cookies contain a unique identifier tied to a specific visitor. When a visitor's browser sends an HTTP request to a website server, the request includes the cookie or cookies that allow the server to identify the visitor.

32.     First-party trackers and cookies are those developed and set by the web server with which the visitor is knowingly communicating. Here, first-party trackers and cookies are those developed by Defendant and set by Defendant's website, www.allstate.com.

33.     Third-party trackers and cookies are those developed and set by a third-party company or domain. Common third-party trackers and cookies include those developed by Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube, which are embedded in Defendant's website. When a visitor's browser loads a webpage containing an

embedded third-party tracker, the tracker – which is simply a script, i.e., lines of code – instructs the visitor's browser to determine whether that third-party's cookie is already stored on the visitor's device. If not, the tracker instructs the browser to store a new cookie uniquely associated with that visitor. If so, the tracker instructs the browser to send the stored cookie to the third-party's server, typically along with additional information about the visitor's browsing activity. Because third-party cookies persist across multiple sessions and webpages, third-party cookies allow their developers to track specific individual's browsing across websites and sessions.

34.    Alternatively, a third-party tracker like those from Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube may use a different identifier, such as the consumer's IP address. Like a cookie, an IP address enables third parties to track a specific consumer's browsing across multiple websites and sections.

35.    Third-party trackers and cookies like those present on Defendant's website are generally invisible to the visitor, unless the visitor uses custom software designed to reveal trackers and cookies.

36.    When a visitor accesses a webpage containing third-party trackers and cookies, the trackers instantaneously intercept and duplicate communications sent between the visitor's browser and the website's server. Duplicated communications include the HTTP "GET" requests through which the visitor's browser requests the webpage and related resources, as well as the HTTP "POST requests, which typically deliver information the visitor entered on the site.

37.    Thus, while it appears to the visitor that their browser is communicating only with the owner of a specific website, in fact their communications are intercepted and shared in real-time with undisclosed third parties.

38.    Here, while visitors to www.allstate.com believe they are communicating only with Defendant, in fact their communications are intercepted and shared in real-time with various third parties – including Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube – via the third-party trackers Defendant embedded in its website.

39.    Third-party trackers and cookies represent an invasion of privacy. When third-party trackers and cookies are present on consumer-facing websites, information that consumers expect to remain private between themselves and the website's owner is surreptitiously intercepted and shared with undisclosed third parties.

40.    Accordingly, many websites allow visitors to affirmatively opt-out of third-party trackers and cookies. These opt-out tools are especially relevant where, as here, the website collects information that is particularly sensitive and private, such as the visitor's full name, location, and the assets they own and insurance products they need. The ability to opt-out of third-party tracking gives visitors comfort they may safely share private and sensitive information with a specific company – here, their insurance provider – without fear that the information will be shared more widely. Were it not for the ability to opt-out of third-party tracking, many visitors would not be comfortable entering their financial and other information on the Internet.

41.    Defendant purports to offer a tool by which website visitors may opt-out of third-party trackers and cookies, in the form of a "cookie banner" that appears when the visitor first loads the webpage and persists until the user interacts with the banner.

42.    Unfortunately for Plaintiffs and members of the proposed Class, Defendant's purported opt-out mechanism is illusory. Defendant embeds third-party trackers and cookies even if the visitor declines consent via the Defendant's cookie banner. Thus, Defendant shares visitors'

sensitive and private information with third parties, even after explicitly promising it will not do so.

III.     **Defendant Falsely Promises that Website Visitors May Opt-Out of Third-Party Cookies and Tracking.**

43.     When a customer or prospective customer arrives on Defendant's website, Defendant displays a popup "cookie banner," which purports to allow the visitor to opt-out of third-party tracking. The cookie banner is designed to give consumers comfort that their browsing activity, their names, their locations, the insurance products they search for, and the additional information they enter into Defendant's website will not be shared with third parties.

44.     The banner appears as a pop-up overlay displayed on all pages of the website. The banner persists on every page unless and until the user interacts with it. As shown below, the banner states that "[t]his website uses cookies . . . for advertising" and that "[w]e use and share you information with . . . advertising and other partners as described in our privacy statement." The banner represents that visitors may "opt out of sharing your information for targeted advertising" by selecting the blue "Do not sell or share my personal information" button. The banner also includes a grey "More information" button.



45.     When a visitor clicks on "More information," a popup appears, shown below. This popup provides more detail on the "advertising" cookies and trackers that Defendant promises to block if the visitor declines consent. In the popup, Defendant represents that visitors may opt out

of cookies and trackers used for the purpose of "[t]argeted online advertising," either by selecting the corresponding slider, or by clicking "Opt out of targeted online advertising." The popup explains that "[a]ll website visitors . . . can opt out of this kind of sharing."



**Allstate.** Cookies and targeted online advertising     ✕

About ads/cookies

**Targeted online advertising**

Functional and performance cookies

## Targeted online advertising

**Allowed**

Some state laws grant residents the right to opt out of the sale or sharing of their personal information for targeted online advertising. All website visitors, regardless of residency, can opt out of this kind of sharing by turning the toggle switch to "Off" or by selecting the "Opt out of targeted online advertising" button below.

Please note that this request is linked to your browser. If you clear cookies from your browser, you will need to make this selection again.

**Confirm my choice**

**Opt out of targeted online advertising**

Powered by **onetrust**



46.     Defendant's privacy policy confirms that "our online marketing and advertising providers [like Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube] may use information about your activities on our Sites . . . to help tailor our advertisements or offers to your interests."[5] Further, Defendant states that "we provide information about your online activities to third-party advertising companies, or allow those advertising companies to collect the information using cookies and similar technologies, and allow the

---

[5] Available at: https://www.allstate.com/privacy-center/aic-privacy-statement

advertising companies to combine that information with information they collect on other unrelated sites to provide you with relevant, targeted advertising." Defendant's privacy policy then repeats the claim from its cookie banner that "[y]ou may opt-out of this sharing" by selecting "[o]pt out of targeted online advertising." Defendant's privacy policy identifies "Adobe, Google and Microsoft" as "third-party marketing and advertising partners."

47.    Defendant's cookie banner, privacy policy, and associated "More information" popup create the illusion that Defendant is a responsible steward of visitors' private information, and that consumers have control over whether the information they share with Defendant will in turn be shared with third parties. In fact, Defendant ignores consumer's privacy and stated preferences. The cookie banner is meaningless. Defendant installs third-party trackers and cookies, including "Advertising" cookies and trackers, and specifically including trackers from Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube, regardless of whether visitors opt-out.

48.    Even after visitors decline consent via the cookie banner or "More information" popup, Defendant installs at least the following third-party trackers and cookies on the visitors' browsers as they navigate Defendant's website, each of which is used for the purpose of "targeted online advertising," i.e., precisely the cookies and trackers Defendant promised to remove:

> a.    Adobe's "everest_g_v2," "demdex," "s_vi_ux7Ex7Ffx7Eudsbutydgur," and "DST" cookies, along with trackers from Adobe that cause visitor information, including first name, last name, postal code, state, military status, vehicle year, make, and model, and the insurance products searched for and/or purchased, to be sent to the domains "edge.adobedc.net," "allstate.tt.omtrdc.net," and "smetrics.allstate.com." Adobe's

documentation includes the "everest_g_v2" cookie in its own list of "Advertising cookies" used to "map ad engagement events to conversion events and, potentially, to use that information to optimize ad bids."[6] Adobe's documentation also explains that domains of the form "smetrics.yourdomain.com" are used to "rout[e] data collection through a subdomain" that appears to belong to the first-party website, even though it is actually used to collect data for Adobe. This so-called "CNAME-based tracking" is used "to maintain data continuity" by "bypassing many browser tracking blocks."[7]

b. Meta/Facebook's "fbp" cookie, along with trackers from Meta/Facebook that cause visitor information to be shared with the domain "facebook.com/tr." Meta/Facebook's "fbp" cookie is associated with the Meta Pixel and Facebook's Conversions API[8] tool, which are used for the purpose of "optimiz[ing] ad targeting."[9]

c. Pinterest's "_pinterest_sess," "_auth," and "ar_debug" cookies, along with trackers from Pinterest that case visitor information to be shared with the domain "ct.pinterest.com."

d. Google's "NID," "OTZ," and "SID" cookies, along with Trackers from Google that cause visitor information to be sent to the domain

---

[6] Quoted text available at: https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/advertising

[7] Quoted text available at: https://experienceleague.adobe.com/en/perspectives/privacy-first-adobe-analytics-cookie-strategy

[8] *See* Facebook developer documentation at: https://developers.facebook.com/docs/marketing-api/conversions-api

[9] Quoted text available at: https://developers.facebook.com/docs/marketing-api/conversions-api

"google.com/ccm/collect." Google's website includes a page describing its cookies.[10] The page describes the "NID" cookie as an "Advertising" cookie that "can be used to show ads in Google Services for signed-out users." In other words, it is used to display targeted ads to individuals who are not currently signed in to a Google account.

e.  DoubleClick's "auid" cookie, along with trackers from DoubleClick that cause visitor information to be shared with the domain "googleads.g.doubleclick.net." Data transmitted to DoubleClick and the Google Ads server is inherently used for targeted advertising and marketing purposes.

f.  Trackers from Invoca that cause visitor information to be shared with the domain "pnapi.invoca.net." Invoca is a call tracking and marketing attribution platform used to link online user activity and advertising campaigns to offline phone calls. It is often used to enable serving targeted ads to the same individual through multiple channels, including phone calls.

g.  Trackers from Acoustic that cause visitor information to be shared with the domain "pages08.net." Acoustic is a targeted advertising company. The landing page of its website states that Acoustic "gives direct-to-consumer brands a Performance Edge, helping them turn consumer intent into messages across email, SMS, WhatsApp, mobile, and web that drive engagement and retention."[11]

---

[10] Available at: https://policies.google.com/technologies/cookies?hl=en-US#types-of-cookies
[11] Quoted text available at: https://www.acoustic.com/

    h.   YouTube's "YSC" and "VISITOR_INFO1_LIVE" cookies. Google's website page describing its cookies states that "YouTube May also use . . . the . . . 'VISITOR_INFO1_LIVE' cookie[] for advertising."[12]

49. Thus, the representations Defendant makes in its cookie banner, associated popup, and privacy policy are false. Even after visitors decline consent to third-party trackers and cookies, Defendant betrays their trust and installs third-party trackers and cookies on their browsers anyway. The third-party trackers and cookies it installs include "Advertising" cookies and trackers that Defendant expressly promises will not be installed if the visitor opts out. The third-party trackers it installs include trackers from Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube.

**IV.   Consumers Place Monetary Value on Privacy Promises.**

50. "Every time you go shopping, you share intimate details about your consumption patterns with retailers."[13] An anecdote published by the New York Times in 2012 demonstrates the point:

> Andrew Pole had just started working as a statistician for Target in 2002, when two colleagues from the marketing department stopped by his desk to ask an odd question: "If we wanted to figure out if a customer is pregnant, even if she didn't want us to know, can you do that?"
>
> Target has a baby-shower registry, and Pole started there, observing how shopping habits changed as a woman approached her due date, which women on the registry had willingly disclosed. … As Pole's computers crawled through the data, he was able to identify about 26 products that, when analyzed together, allowed him to assign each shopper a 'pregnancy prediction' score.
>
> About a year after Pole created his pregnancy-prediction mode, a man walked into a Target outside Minneapolis and demanded to see the manager. He was clutching coupons that had been sent to this daughter, and he was angry, according to an

---

[12] Quoted text available at: https://policies.google.com/technologies/cookies/embedded?hl=en-US

[13] https://www.forbes.com/sites/kashmirhill/2012/02/16/how-target-figured-out-a-teen-girl-was-pregnant-before-her-father-did/

employee who participated in the conversation. "My daughter got this in the mail!" he said. "She's still in high school, and you're sending her coupons for baby clothes and cribs? Are you trying to encourage her to get pregnant?" The manager didn't have any idea what the man was talking about. He looked at the mailer. Sure enough, it was addressed to the man's daughter and contained advertisements for maternity clothing, nursery furniture and pictures of smiling infants. The manager apologized and then called a few days later to apologize again. On the phone, though, the father was somewhat abashed. "I had a talk with my daughter," he said. … "She's due in August. I owe you an apology."[14]

51.     The anecdote's point is even more relevant today than it was at the time of writing in 2012. For consumer-facing companies like Defendant, "the exhaustive rendering of our conscious and unconscious patterns into data sets and algorithms has revolutionized what they know about us and, therefore, how precisely they can sell."[15]

52.     To facilitate their advertising efforts, consumer-facing companies like Defendant rely on third parties who can identify prospective customers with discomforting precision. In addition to paying those third parties for targeted advertising services when they advertise their own products, consumer-facing companies also provide the fuel that enables precision targeting: personal information collected from online browsing activity. And with the rise of artificial intelligence, that precision continues to increase. As one commentator explains:

> With access to vast amounts of consumer data, AI algorithms can create highly personalized marketing messages that exploit individuals' vulnerabilities and desires. As a result, consumers may be swayed to make purchases that are not in their best interests or even harmful to their health and well-being. Moreover, the opaque nature of AI algorithms makes it difficult for consumers to understand how their data is being used and how marketing messages are being tailored to them. This lack of transparency creates an uneven playing field, where businesses have an unfair advantage over consumers unaware of how much their behavior is being monitored and influenced.[16]

---

[14] https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html
[15] https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html
[16] https://www.forbes.com/sites/elijahclark/2024/03/14/the-ethical-dilemma-of-ai-in-marketing-a-slippery-slope/

53.    As online surveillance continues to grow more sophisticated and pervasive, consumers' concerns over data privacy are reaching a high point. Recent surveys demonstrate the point:

"93% of adults say that being in control of who can get information about them is important; 74% feel this is 'very important,' while 19% say it is 'somewhat important.'"[17]

"86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy."[18]

"[A]n overwhelming majority of Americans (82%) believe data privacy matters more to them than ever before, with many (74%) expressing worry about how organizations handle their personal data."[19]

"72% [of consumers] say there should be more government regulation of what companies can do with their customers' personal information."[20]

54.    Recent surveys also demonstrate that these concerns over data privacy have a substantial impact on consumer preferences and purchasing behavior:

"93% of Americans would switch to a company that prioritizes their data privacy."[21]

"85% of consumers … deleted a phone app, 82% opted out of sharing personal data, 78% avoided a particular website and 67% decided against making an online purchase due to private concerns."[22]

"81% of consumers said they need to trust a brand to buy from them."[23]

---

[17] https://www.pewresearch.org/internet/2015/05/20/americans-views-about-data-collection-and-security/

[18] https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/

[19] https://finance.yahoo.com/news/growing-concerns-data-privacy-ethical-112500004.html2

[20] https://www.pewresearch.org/internet/2023/10/18/views-of-data-privacy-risks-personal-data-and-digital-privacy-laws/#americans-largely-favor-more-regulation-to-protect-personal-information

[21] https://finance.yahoo.com/news/growing-concerns-data-privacy-ethical-112500004.html2

[22] https://iapp.org/news/a/most-consumers-want-data-privacy-and-will-act-to-defend-it

[23] https://www.forbes.com/councils/forbestechcouncil/2020/12/14/the-rising-concern-around-consumer-data-and-privacy/

"75% of [survey] respondents indicat[ed] that trust in data practices influences their buying choices."[24]

"About half (52%) of U.S. adults said they decided recently not to use a product or service because they were worried about how much personal information would be collected about them."[25]

55.     And recent surveys show that consumers are particularly worried about the risks posed by data brokers and artificial intelligence:

"78% of consumers believe companies must commit to ethical AI standards."[26]

"81% of consumers think the information collected by AI companies will be used in ways people are uncomfortable with, as well as ways that were not originally intended."[27]

"Roughly four-in-ten Americans say they are very worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%)."[28]

## V.     The Information Defendant Enabled Third Parties to Intercept is Sensitive and Private.

56.     The information Defendant encouraged and assisted Third Parties in intercepting includes private, sensitive, and confidential information that Plaintiffs and Class Members submitted to Defendant's website, including: the pages they viewed and the buttons they clicked; their first and last names; their zip codes and locations; the types of assets they own; the insurance products they own or searched for; and the fact of making a claim or payment on an existing policy. Upon information and belief, for consumers who used the website to create an account and manage and existing insurance policy, Defendant also shared private information related to that account.

---

[24] https://www.forbes.com/sites/tonybradley/2024/10/30/privacy-and-trust-in-the-ai-age/
[25] https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/
[26] https://www.forbes.com/sites/tonybradley/2024/10/30/privacy-and-trust-in-the-ai-age/
[27] https://iapp.org/resources/article/consumer-perspectives-of-privacy-and-ai/
[28] https://www.pewresearch.org/internet/2023/10/18/views-of-data-privacy-risks-personal-data-and-digital-privacy-laws/

Plaintiffs refer herein to the information Defendant's website disclosed as the "Disclosed Information."

57.     For example, visitors who visit the site to obtain a quote on an insurance product can use the primary on-site flow promoted by Defendant for that purpose. Clicking on "get a quote" leads to a page on which visitors are prompted to enter their zip code and select one or more of seven types of insurance offered by Defendant. Visitors then are prompted to click "start my quote," after which they are shown a series of screens that solicit personal information related to the relevant insurance product(s).

58.     In all cases, the information solicited by Defendant and disclosed to Third Parties as visitors follow this flow includes:

       a.  a unique identifier tied to the visitor, such as an IP address or cookie;

       b.  the visitor's first name;

       c.  the visitor's last name;

       d.  the visitor's zip code;

       e.  the visitor's state;

       f.  the asset(s) the visitor owns that the visitor is seeking to ensure (e.g., automobile, condo, snowmobile, motorcycle);

       g.  whether the visitor owns or rents their home;

       h.  the specific insurance products the visitor is shopping for (e.g., "renters," "term life");

       i.  pages viewed and buttons clicked.

59.     In the case where the visitor selects car insurance, the information solicited by Defendant and disclosed to Third Parties includes the following additional information:

    a.   whether the visitor is the primary insured;

    b.   the age of the visitor;

    c.   whether the visitor had prior accidents;

    d.   whether the visitor is a defensive driver;

    e.   whether the visitor is in the military;

    f.   whether the visitor rents or owns;

    g.   the car's year;

    h.   the car's make;

    i.   the car's model.

60.    The screenshots below were taken after "Opt[ing] out of targeted online advertising" on Defendant's cookie banner. That the visitor opted out is shown by the network traffic below, which reflects the visitor's choice to "Reject All" non-essential cookies and trackers on Defendant's cookie banner:



61.    Despite the visitor's choice to "Opt out" and "Reject All" cookies and trackers, the screenshots below depict information Defendant solicited from insurance applicants being intercepted by and shared with Third Parties.

a. Below, the visitor's zip code, state, and the insurance product they are applying for ("HO" represents home insurance) are intercepted by Adobe and sent to Adobe via the domain "tt.omtrdc.net."

b. Below, the same information is intercepted by DoubleClick and sent to Google/DoubleClick via the domain "googleads.g.doubleclick.net."



c. Below, the visitor's military status ("MILITARY:NO"), age, accident history ("ACCIDENT:NO"), status as a defensive driver ("DEFENSIVEDRIVER:NO"), vehicle year ("2010"), vehicle make ("TOYOTA") and vehicle model ("TUNDRA 4WD TRCK") are intercepted by Adobe and sent to Adobe via the domain "smetrics.allstate.com."



62.     In all examples discussed above, the Disclosed Information includes a data point such as an IP address or other device identifier that enables unique identification of a specific visitor.

63.     The Disclosed Information allows Third Parties to establish a particular individual's physical location, which assets they own, whether they own or rent their home, their first name, their last name, and the specific insurance products in which they might be interested, among other information. Defendant's unauthorized disclosure engenders a variety of harmful consequences,

including: potentially higher insurance rates by allowing identification and over-charging "price-optimized" customers; heightened risk of data breach; risk of unwanted and unsolicited marketing and sales contacts; loss of value in the individual's information loss of trust in insurance providers and other custodians of financial information leading to under-use.

## VI.  Defendant Profits from its Non-Consensual Facilitation of Third-Parties' Interception of Visitors' Private Information, as do the Third Parties.

64.     On information and belief, the Third Parties with whom Defendant shares visitors' private information derive profit from the Disclosed Information through one or more of the following mechanisms: (1) building individualized profiles about visitors' interests, assets, and insurance product interests for the purpose of selling targeted advertising; (2) selling the Disclosed Information, usually aggregated with additional information gleaned from other sources, to other third and fourth parties; and (3) providing analytics and other services in exchange for a subscription fee or other payment.

65.     Data harvesting is big business. As one court recently held, "[the Defendant] cannot seriously dispute that browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. As [the plaintiff's expert] explained, there is an entire 'data industry' and estimates suggests that that industry 'now generates combined annual revenues of approximately $300 billion dollars.'" *John Doe et al v. Virginia Mason Medical Center*, No. 19-2-26674-1 SEA, 2024 WL 3517759 (Wash. Sup. Ct., June 6, 2024).

66.     On information and belief, Defendant also profits from its sharing of Disclosed Information by one or more of the following mechanisms:

67.     First, Defendant earns sales revenue by more effectively advertising its own products on other websites. Defendant's online advertising efforts become more effective when

28

they allow Third Party advertising platforms like Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube to intercept customer's online communications and, in some cases, bundle this information with other information the platforms collected while the consumer browsed other sites. If a consumer navigates to ameritas.com to explore insurance but ultimately does not make a purchase, they might then see ads for Ameritas on other websites or while consuming other electronic media. These "retargeting" ads are made possible because Ameritas allowed the advertising platforms to silently observe what the consumer did while on Ameritas' website. Those advertising platforms can then serve Ameritas ads to the same consumers who visited Ameritas' website.

68.     Second, Defendant may receive payments from Third Parties in exchange for those Third Parties' placement of trackers and related cookies on the Defendant's website.

69.     Third, Defendant may receive a service or services from Third Parties either for free or at a discounted price. The service may be a technological tool embedded in the website, such as tools to improve functionality or to monitor website usage and performance.

70.     Fourth, Defendant may receive the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price.

71.     Plaintiff anticipates learning the precise mechanism(s) by which Defendant profits from installation and deployment of the Trackers, including additional means by which Defendant profits from the technologies described herein, through discovery.

**VII.     Defendant's Disclosure Violates Standards of Conduct in the Insurance Industry.**

72.     Information about insurance and other financial products is among the most confidential and sensitive. Mishandling of this information can have serious consequences, including denial of credit or employment and differential pricing leading to higher insurance premiums. If people do not trust that the financial and personal information they share with

potential insurers will be kept private, they may be less likely to seek insurance or other financial products. Furthermore, protecting the confidentiality of information shared with insurers and providers of financial products is necessary to maintain public trust in the industry.

73.     Recognizing these facts, Congress enacted the Gramm-Leach-Bliley Act ("GLB"), 15 U.S.C. §§6801-6809, which regulates how insurers and other financial institutions must safeguard information "provided by a consumer to a financial institution" in connection with seeking a service from that institution. *See id.*, §6809. Under the GLB, as a provider of insurance, Defendant may not disclose information provided by the consumer to a third party unless said disclosure is "clearly and conspicuously" disclosed and the consumer "is given the opportunity . . . to direct that such information not be disclosed to such third party." *Id.*, §6802.

74.     Defendant's actions violate the GLB. As alleged above, the information collected is provided by the consumer in connection with seeking an insurance product. And while Defendant purports to honor the GLB by providing an opt-out mechanism in its cookie banner, that opt-out mechanism is illusory. This is a violation of both the letter and spirit of the GLB. Defendant's cookie banner provides consumers with the illusion their information will not be shared, while Defendant pulls the rug out from underneath them.

75.     Defendant's disclosures also violate California's Consumer Privacy Act. *See* Cal. Civ. Code § 1798.100 *et seq*. Pursuant to that statute, "A business that sells or shares consumers' personal information, or that discloses consumers' personal information for a business purpose, shall disclose" that fact to the consumer. *Id.*, § 1798.115(c). Here, Defendant failed to provide an accurate disclosure, as required by California law. Defendant professed not to allow third-party advertisers to intercept Plaintiff's and Class members' information, while it in fact did so disclose, in contradiction with Defendant's express representations.

30

## PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

**Plaintiff Johnson**

76.     Plaintiff Marcus Johnson is Defendant's customer who used Defendant's website to search for and apply for insurance.

77.     On information and belief, Plaintiff Johnson was presented with the cookie banner on Defendant's website, and consistent with his normal practice of routinely declining cookies when offered the choice, he declined consent to the use of advertising cookies and trackers.

78.     Plaintiff is a Facebook and Instagram user. After Plaintiff used Defendant's website, targeted advertisements began appearing on Facebook and Instagram related to the information he shared with Defendant's website.

79.     Plaintiff reasonably expected that his online communications with Defendant were confidential, solely between himself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by a Third Party for the purpose of advertising.

80.     Plaintiff provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's cookie banner, and the law.

81.     Plaintiff never intended to sell the Disclosed Information, nor would he have permitted it to be made available for sale on the resale market.

82.     On information and belief, through the use of cookies and trackers, Defendant disclosed to Third Parties at least the following information, some of which he provided to Defendant as part of his searching for and purchasing car and rental insurance from Defendant:

      a.   The pages and content Plaintiff viewed;

      b.   Plaintiff's seeking of car and rental insurance;

    c.  Plaintiff's first name;

    d.  Plaintiff's last name;

    e.  Plaintiff's location, including zip code and state;

    f.  Plaintiff's ownership of a car;

    g.  Plaintiff's non-ownership of a home and status as a renter;

    h.  Additional identifying information unique to Plaintiff, including his IP address and unique identifying cookies set by Third Parties.

83.    Plaintiff accessed Defendant's website at Defendant's direction and encouragement.

84.    Plaintiff would not have shared his information with Defendant had he known it would be shared with Third Parties in violation of Defendant's representations and legal obligations.

85.    As a result of Defendant's Disclosure of Plaintiff's Disclosed Information to Third Parties without authorization, Plaintiff was harmed in at least the following ways:

    a.  Loss of privacy;

    b.  Unauthorized disclosure of his assets, name, location, interest in insurance, and other Disclosed Information;

    c.  Unauthorized access to his assets, name, location, interest in insurance, and other Disclosed Information by Third Parties;

    d.  Defendant benefited from its sharing of assets, name, location, interest in insurance, and other Disclosed Information without sharing that benefit with Plaintiff;

e. Lost benefit of his bargain with Defendant, as Plaintiff did not receive the reasonable privacy and data security protections he was promised;

f. Defendant and Third Parties enriched themselves at Plaintiff's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information;

g. Defendant profited from collecting and disclosing Plaintiff's Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff, which may include: (1) increased payments from the placement of ads on Defendant's website, (2) direct payments from Third Parties, (3) free or reduced cost for services, including services related to the implementation and monitoring of the Defendant's website, (4) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price, and/or (5) increased efficacy and decreased costs of advertisements by Defendant on other websites;

h. Embarrassment, humiliation, frustration, and emotional distress;

i. Decreased value of Plaintiff's Disclosed Information; and

j. Increased risk of harm resulting from the use and disclosure of Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information.

**Plaintiff Chiu**

86. Plaintiff Abraham Chiu is Defendant's customer who used Defendant's website to search for and apply for insurance.

87. On information and belief, Plaintiff Chiu was presented with the cookie banner on Defendant's website, and consistent with his normal practice of routinely declining cookies when offered the choice, he declined consent to the use of advertising cookies and trackers.

88. Plaintiff is a Facebook user. After Plaintiff used Defendant's website, targeted advertisements began appearing on Facebook related to the information he shared with Defendant's website.

89. Plaintiff reasonably expected that his online communications with Defendant were confidential, solely between himself and Defendant, and that, as such, those communications would not be transmitted to or intercepted by a Third Party for the purpose of advertising.

90. Plaintiff provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's cookie banner, and the law.

91. Plaintiff never intended to sell the Disclosed Information, nor would he have permitted it to be made available for sale on the resale market.

92. On information and belief, through the use of cookies and trackers, Defendant disclosed to Third Parties at least the following information, some of which he provided to Defendant as part of his searching for and purchasing car and rental insurance from Defendant:

    a. The pages and content Plaintiff viewed;

    b. Plaintiff's seeking of car insurance;

    c. Plaintiff's first name;

    d. Plaintiff's last name;

    e. Plaintiff's location, including zip code and state;

    f. Plaintiff's ownership of a car;

g. Additional identifying information unique to Plaintiff, including his IP address and unique identifying cookies set by Third Parties.

93. Plaintiff accessed Defendant's website at Defendant's direction and encouragement.

94. Plaintiff would not have shared his information with Defendant had he known it would be shared with Third Parties in violation of Defendant's representations and legal obligations.

95. As a result of Defendant's Disclosure of Plaintiff's Disclosed Information to Third Parties without authorization, Plaintiff was harmed in at least the following ways:

a. Loss of privacy;

b. Unauthorized disclosure of his assets, name, location, interest in insurance, and other Disclosed Information;

c. Unauthorized access to his assets, name, location, interest in insurance, and other Disclosed Information by Third Parties;

d. Defendant benefited from its sharing of assets, name, location, interest in insurance, and other Disclosed Information without sharing that benefit with Plaintiff;

e. Lost benefit of his bargain with Defendant, as Plaintiff did not receive the reasonable privacy and data security protections he was promised;

f. Defendant and Third Parties enriched themselves at Plaintiff's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information;

g. Defendant profited from collecting and disclosing Plaintiff's Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff, which may include: (1) increased payments from the placement of ads on Defendant's website, (2) direct payments from Third Parties, (3) free or reduced cost for services, including services related to the implementation and monitoring of the Defendant's website, (4) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price, and/or (5) increased efficacy and decreased costs of advertisements by Defendant on other websites;

h. Embarrassment, humiliation, frustration, and emotional distress;

i. Decreased value of Plaintiff's Disclosed Information; and

j. Increased risk of harm resulting from the use and disclosure of Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information.

**Plaintiff Allen**

96. Plaintiff Crystal Allen is Defendant's customer who used Defendant's website to search for and apply for insurance.

97. On information and belief, Plaintiff Allen was presented with the cookie banner on Defendant's website, and consistent with her normal practice of routinely declining cookies when offered the choice, she declined consent to the use of advertising cookies and trackers.

98. Plaintiff is a Facebook user. After Plaintiff used Defendant's website, targeted advertisements began appearing on Facebook related to the information she shared with Defendant's website.

99.     Plaintiff provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's cookie banner, and the law. Plaintiff reasonably expected that her communications with Defendant were confidential, solely between Plaintiff and Defendant, and that, as such, any information submitted would not be transmitted to or intercepted by Third Parties for the purpose of advertising.

100.    Plaintiff never intended to sell the Disclosed Information, nor would she have permitted it to be made available for sale on the resale market.

101.    On information and belief, through the use of cookies and trackers, Defendant disclosed to Third Parties at least the following information, some of which she provided to Defendant as part of her searching for and purchasing insurance from Defendant:

        a.   The pages and content Plaintiff viewed;

        b.   Plaintiff's seeking of specific types of insurance;

        c.   Plaintiff's first name;

        d.   Plaintiff's last name;

        e.   Plaintiff's location, including zip code and state;

        f.   Plaintiff's ownership of assets needing insurance;

        g.   Additional identifying information unique to Plaintiff, including her IP address and unique identifying cookies set by Third Parties.

102.    Plaintiff accessed Defendant's website at Defendant's direction and encouragement.

103.    Plaintiff would not have shared her information with Defendant had she known it would be shared with Third Parties in violation of Defendant's representations and legal obligations.

104.    As a result of Defendant's Disclosure of Plaintiff's Disclosed Information to Third Parties without authorization, Plaintiff was harmed in at least the following ways:

a.   Loss of privacy;

b.   Unauthorized disclosure of her assets, name, location, interest in insurance, and other Disclosed Information;

c.   Unauthorized access to her assets, name, location, interest in insurance, and other Disclosed Information by Third Parties;

d.   Defendant benefited from its sharing of assets, name, location, interest in insurance, and other Disclosed Information without sharing that benefit with Plaintiff;

e.   Lost benefit of his bargain with Defendant, as Plaintiff did not receive the reasonable privacy and data security protections she was promised;

f.   Defendant and Third Parties enriched themselves at Plaintiff's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information;

g.   Defendant profited from collecting and disclosing Plaintiff's Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff, which may include: (1) increased payments from the placement of ads on Defendant's website, (2) direct payments from Third Parties, (3) free or reduced cost for services, including services related to the implementation and monitoring of the Defendant's website, (4) the ability to purchase ad space on other websites at a reduced price or at a

greater value for the same price, and/or (5) increased efficacy and decreased costs of advertisements by Defendant on other websites;

h. Embarrassment, humiliation, frustration, and emotional distress;

i. Decreased value of Plaintiff's Disclosed Information; and

j. Increased risk of harm resulting from the use and disclosure of Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information.

**Plaintiff Gray**

105.    Plaintiff Anessa Gray is Defendant's customer who used Defendant's website to search for and apply for homeowner's and automobile insurance.

106.    On information and belief, Plaintiff Gray was presented with the cookie banner on Defendant's website, and consistent with her normal practice of routinely declining cookies when offered the choice, she declined consent to the use of advertising cookies and trackers.

107.    Plaintiff provided information to Defendant and trusted that the information would be safeguarded according to industry standards, the representations in Defendant's cookie banner, and the law. Plaintiff reasonably expected that her communications with Defendant were confidential, solely between Plaintiff and Defendant, and that, as such, any information submitted would not be transmitted to or intercepted by Third Parties for the purpose of advertising.

108.    Plaintiff never intended to sell the Disclosed Information, nor would she have permitted it to be made available for sale on the resale market.

109.    On information and belief, through the use of cookies and trackers, Defendant disclosed at least the following information to Third Parties, some of which she provided to Defendant as part of her searching for and purchasing car and home insurance from Defendant:

    a.   The pages and content Plaintiff viewed;

    b.   Plaintiff's seeking of car and home insurance;

    c.   Plaintiff's first name;

    d.   Plaintiff's last name;

    e.   Plaintiff's location, including zip code and state;

    f.   Plaintiff's ownership of a car;

    g.   Plaintiff's ownership of a home;

    h.   Additional identifying information unique to Plaintiff, including her IP address and unique identifying cookies set by Third Parties.

110.    Plaintiff accessed Defendant's website at Defendant's direction and encouragement.

111.    Plaintiff would not have shared her information with Defendant had she known it would be shared with Third Parties in violation of Defendant's representations and legal obligations.

112.    As a result of Defendant's Disclosure of Plaintiff's Disclosed Information to Third Parties without authorization, Plaintiff was harmed in at least the following ways:

    a.   Loss of privacy;

    b.   Unauthorized disclosure of her assets, name, location, interest in insurance, and other Disclosed Information;

    c.   Unauthorized access to her assets, name, location, interest in insurance, and other Disclosed Information by Third Parties;

d.   Defendant benefited from its sharing of assets, name, location, interest in insurance, and other Disclosed Information without sharing that benefit with Plaintiff;

e.   Lost benefit of his bargain with Defendant, as Plaintiff did not receive the reasonable privacy and data security protections she was promised;

f.   Defendant and Third Parties enriched themselves at Plaintiff's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information;

g.   Defendant profited from collecting and disclosing Plaintiff's Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff, which may include: (1) increased payments from the placement of ads on Defendant's website, (2) direct payments from Third Parties, (3) free or reduced cost for services, including services related to the implementation and monitoring of the Defendant's website, (4) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price, and/or (5) increased efficacy and decreased costs of advertisements by Defendant on other websites;

h.   Embarrassment, humiliation, frustration, and emotional distress;

i.   Decreased value of Plaintiff's Disclosed Information; and

j.   Increased risk of harm resulting from the use and disclosure of Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information.

## TOLLING, CONCEALMENT, AND ESTOPPEL

113.     The applicable statutes of limitation have been tolled because of Defendant's knowing and active concealment and denial of the facts alleged herein.

114.     Defendant actively concealed its use of cookies and trackers by providing an illusory opt-out function that did not, in fact, accomplish an opt-out. Defendant surreptitiously incorporated cookies and trackers into its website while explicitly denying it was doing so to Plaintiffs and members of the putative Class.

115.     Plaintiffs and putative Class members could not have discovered Defendant's conduct, because Defendant actively concealed its conduct and mislead Plaintiffs and putative Class members via its deceptive cookie banner.

116.     All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of Plaintiffs' and the Class's Disclosed Information has continued unabated. Further, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

117.     Plaintiffs bring this class action on behalf of themselves and on behalf of all other similarly situated persons pursuant to Fed. R. Civ. P. 23.

118.     Plaintiffs seek to represent the following classes (together, the "Class"):

**Nationwide Class:** All residents of the United States within the applicable statutes of limitation who rejected cookies on Defendant's website and whose information was disclosed by Defendant to Third Parties through Defendant's websites' tracking technologies without authorization.

**Illinois Subclass:** All residents of Illinois within the applicable statute of limitations who rejected cookies on Defendant's website and whose information was disclosed by Defendant to Third Parties through Defendant's websites' tracking technologies without authorization**.**

42

**California Subclass:** All residents of California within the applicable statute of limitations who rejected cookies on Defendant's website and whose information was disclosed by Defendant to Third Parties through Defendant's websites' tracking technologies without authorization**.**

119.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

120.     Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

121.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

122.     <u>Numerosity</u>: Class Members are so numerous and dispersed that joinder of all members is impracticable. Upon information and belief, there are likely tens of thousands of individuals in Illinois and California whose communications were improperly used or disclosed by Defendant. The figures for the Nationwide Class are larger still.

123.     <u>Ascertainability</u>. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

124.     <u>Commonality and Predominance</u>: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

  a.   Whether Defendant disclosed Class Members' Disclosed Information to Third Parties;

  b.   Whether Class Members consented to Defendant's disclosure of their Disclosed Information;

c.   Whether Defendant owed duties to Plaintiffs and Class Members to protect their Disclosed Information;

d.   Whether Defendant breached its duty to protect Plaintiffs' and Class Members' Disclosed Information;

e.   Whether Defendant's disclosure of Plaintiffs' and Class Members' Disclosed Information to Third Parties violated laws and/or industry standards;

f.   Whether Defendant's failure to allow visitors a meaningful opportunity to opt out of sharing with Third Parties violated laws and/or industry standards;

g.   Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiffs' and Class Members' Disclosed Information;

h.   Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiffs' and Class Members' Disclosed Information;

i.   Whether Defendant has a contractual obligation to protect Plaintiffs' and Class Members' Disclosed Information and whether it complied with such contractual obligation;

j.   Whether Defendant has a duty of confidence and whether it complied with such obligation;

k.   Whether Defendant's conduct amounted to violations of state consumer protection statutes;

l.   Whether Defendant's conduct amounted to violations of other Illinois and/or California state laws;

m. Whether Defendant should retain Plaintiffs' and Class Members' valuable Disclosed Information;

n. Whether, as a result of Defendant's conduct, Plaintiffs and Class Members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

125. Defendant has engaged in a common course of conduct toward Plaintiffs and the Class Members, in that the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully disclosed and accessed in the same way. As set forth above, the common issues arising from Defendant's conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

126. Typicality: Plaintiffs' claims are typical of those of other Class Members because they all rejected cookies on the Defendant's website yet all had their Disclosed Information compromised as a result of Defendant's use and incorporation of cookies and other tracking technology.

127. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

128.     Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

129.     Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose an enormous burden on the courts.

130.     The nature of this action and the nature of remedies available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to

46

which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

131.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

132.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

133.     Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the Disclosed Information of Plaintiffs and the Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Members, and Defendant may continue to act unlawfully as set forth in this Complaint.

134.     Moreover, Defendant has acted or refused to act on grounds generally applicable to the Classes, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Classes is appropriate.

135.     Likewise, particular issues are appropriate for certification because such claims present only specific common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their sensitive information and other Disclosed Information;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their sensitive information and other Disclosed Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of consumer information;

d. Whether Defendant was negligent and/or negligent per se;

e. Whether an express and/or implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that contract;

f. Whether Defendant breached the contract;

g. In the alternate, whether Defendant was unjustly enriched;

h. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Disclosed Information had been used and disclosed to Third Parties and used for Third Party and fourth parties' benefit;

i. Whether Defendant failed to implement and maintain reasonable security procedures and practices;

j. Whether Defendant invaded Plaintiffs and the Class Members' privacy;

k. Whether Defendant breached its implied duty of confidentiality; and,

l.   Whether Plaintiffs and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**FEDERAL WIRETAP ACT**
**18 U.S.C. § 2511**
**UNAUTHORIZED INTERCEPTION**
**(on behalf of Plaintiffs and the Class)**

136.   Plaintiffs re-allege and incorporate paragraphs 1 through 135 as if fully set forth herein.

137.   The Wiretap Act protects both sending and receipt of communications. 18 U.S.C. Section 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the Act.

138.   The transmissions of Plaintiffs' and Class Members' Disclosed Information to Defendant's website qualifies as a "communication" under the Wiretap Act. *See* 18 U.S.C. § 2510(12).

139.   **Electronic Communications**. The transmission of Disclosed Information between Plaintiffs and Class Members and Defendant's website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

140.   **Content**. The Wiretap Act defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). As alleged above, the Disclosed Information includes

a variety of information containing contents, including visitors' full names, locations, assets, and the types of insurance products they searched for and/or purchased.

141.     **Interception**. The Wiretap Act defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8). As alleged above, Defendant accomplishes, facilitates, and enables the interception of Class members' communications with Defendant by third-party advertisers.

142.     **Electronic, Mechanical or Other Device**. The Wiretap Act defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

   a.   Plaintiffs' and Class Members' browsers;

   b.   Plaintiffs' and Class Members' computing devices;

   c.   Defendant's web-servers;

   d.   Defendant's website; and

   e.   The tracking technology deployed by Defendant to effectuate the sending and acquisition of consumer communications.

143.     By using and embedding cookies and tracking technology on its website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

144.     Defendant intercepted, endeavored to intercept and procured another person to intercept Plaintiffs' and Class Members' electronic communications via the cookies and tracking

technology which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Disclosed Information to Third Parties.

145. Defendant's intercepted communications include, but are not limited to, information Plaintiffs and Class Members entered on Defendant's website while searching for insurance. As alleged above, the Disclosed Information includes the contents of forms and dropdowns Plaintiffs and Class Members filled out on Defendant's website.

146. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

147. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

148. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State, including invasion of privacy, violation of the GLB, and others.

149. Defendant intentionally used the wire or electronic communications to increase its profit margins and save on marketing costs.

150. Defendant specifically used tracking technology to track and to use Plaintiffs' and Class Members' Disclosed Information for financial gain.

151.    Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

152.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy via the tracking technology.

153.    In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of its website, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of Federal and state laws, invading Plaintiffs' and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

**COUNT II**
**FEDERAL WIRETAP ACT**
**18 U.S.C. § 2511**
**UNAUTHORIZED DIVULGENCE**
**(on behalf of Plaintiffs and the Class)**

154.    Plaintiffs re-allege and incorporate the above allegations paragraphs 1 through 135 as if fully set forth herein.

155.    The Wiretap Act provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

156.    **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's website is an electronic

communication service because it provides website users the ability to send or receive electronic communications. Among other communications, the website allows website users to search for insurance products, apply for an insurance quote which entails entering a variety of personal information, pay premiums, and file claims, all of which requires communicating a variety of personal information via the website.

157. **Intentional Divulgence**. Defendant intentionally embedded cookies and tracking technology and was or should have been aware that, if so configured, this could or would divulge Plaintiffs' and Class Members' Disclosed Information. Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications was contemporaneous with their exchange with Defendant's website, to which they directed their communications.

158. Defendant divulged the contents of Plaintiffs' and Class Members' electronic communications without authorization and/or consent. Indeed, Plaintiffs and Class Members expressly declined consent via Defendant's cookie banner.

159. Defendant's divulgence of the contents of Plaintiffs' and the Class Members' communications on its website through the cookies and tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications (ii) Defendant did not procure the "lawful consent" from the website to which Plaintiffs and Class Members provided information.

160. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT III
## ILLINOIS EAVESDROPPING STATUTE
### 720 ILL. COMP. STAT. 5/14 *ET SEQ.*
### (on behalf of Plaintiffs Allen and Gray and the Illinois Subclass)

161.     Plaintiffs re-allege and incorporate paragraphs 1 through 135 as if fully set forth herein.

162.     The Eavesdropping Article of the Illinois Criminal Code (the "Illinois Eavesdropping Statute" or "IES") states that it is a felony for any person to knowingly and intentionally "use[] an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation." 720 Ill. Comp. Stat. 5/14-2(a), -4.

163.     The IES also states that it is a felony for any person to knowingly and intentionally "use[] or disclose[] any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties." *Id*.

164.     For purposes of the IES, "eavesdropping device" means "any device capable of being used to hear or record oral conversation or intercept, or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means[.]" 720 Ill. Comp. Stat. 5/14-1(a).

165.     For purposes of the IES, "surreptitious" means "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 Ill. Comp. Stat. 5/14-1(g).

166.     For purposes of the IES, "private electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system,

when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation. . .." 720 Ill. Comp. Stat. 5/14-1(e).

167.    "A reasonable expectation shall include any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution." *Id*.

168.    Defendant intentionally transmitted and disclosed Plaintiffs' and Class Members' private electronic communications, without the consent of Plaintiffs and Class Members, using the cookies and other tracking technologies described herein.

169.    Defendant intentionally recorded and/or acquired Plaintiffs' and Class Members' private electronic communications for the purpose of disclosing those communications to Third Parties, including Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube t, without the knowledge, consent, or written authorization of Plaintiffs or Class Members.

170.    Plaintiffs and Class Members' communications with Defendant constitute private conversations, communications, and information.

171.    Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via Defendant's website, especially in light of the representations in Defendant's cookie banner and privacy policy.

172.    Plaintiffs and Class Members were unaware that their communications and Disclosed Information were being surreptitiously recorded and transmitted to third parties as they communicated with Defendant through its website.

173.    Without Plaintiffs' or Class Members' knowledge, authorization, or consent, Defendant used the cookies and trackers imbedded and concealed within its website to secretly

record, disclose, and transmit Plaintiffs' and Class Members' private communications to hidden third parties, such as Adobe, Meta/Facebook, Pinterest, Google, DoubleClick, Invoca, Acoustic, and YouTube, as described in the preceding paragraphs.

174.    Under the IES, "[a]ny or all parties to any conversation or electronic communication upon which eavesdropping is practices contrary to this Article shall be entitled to the following remedies: (a) [t]o an injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either; (b) [t]o all actual damages against the eavesdropper or his principal or both; [t]o any punitive damages which may be awarded by the court or by a jury. . . ." 720 Ill. Comp. Stat. 5/14-6.

175.    The eavesdropping devices used in this case include, but are not limited to:

    a.  Plaintiff's and Class Members' personal computing devices;

    b.  Plaintiff's and Class Members' web browsers;

    c.  Plaintiff's and Class Members' browser-managed files;

    d.  The cookies, trackers, and other tracking technologies described herein;

    e.  Defendant's computer servers;

    f.  Third-party source code used by Defendant; and

    g.  Computer servers of the Third Parties to which Plaintiffs' and Class Members' communications were disclosed.

176.    Defendant aided in the interception of communications between Plaintiff and Class Members that were redirected to and recorded by third parties without Plaintiff's or Class Members' consent.

177.    Under the IES, Plaintiffs and the Class Members are entitled to injunctive relief prohibiting further eavesdropping by Defendant, actual damages, and punitive damages.

178.    Defendant's violation of the IES caused Plaintiffs and Class Members the following damages:

     a.  Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

     b.  Defendant eroded the essential confidential nature of the insurer-insured relationship;

     c.  Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

     d.  Plaintiffs and Class Members did not get the full value of the insurance services for which they paid, which included Defendant's promise and duty to maintain confidentiality; and

     e.  Defendant's actions diminished the value of Plaintiffs' and Class Members' Disclosed Information.

     f.  Defendant's actions subjected plaintiffs' and Class Members to risk of harm resulting from the use and disclosure of Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information.

179.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT IV
## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILL. COMP. STAT. § 505/1 *ET SEQ.*
### (on behalf of Plaintiffs Allen and Gray and the Illinois Subclass)

180. Plaintiffs re-allege and incorporate paragraphs through 135 as if fully set forth herein.

181. The Illinois Consumer Fraud and Deceptive Practices Act ("CFDPA") makes it unlawful to employ "[u]nfair methods of competitions and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in [this section] . . . in the conduct of any trade or commerce." 815 Ill. Comp. Stat. § 505/2.

182. Defendant is a "person" as defined by 815 Ill. Comp. Stat. § 505/1.

183. Plaintiffs and the Class Members are "consumers" as defined by 815 Ill. Comp. Stat. § 505/1.

184. Defendant is engaged "in the conduct of trade or commerce" by hosting and publishing the website on which they encouraged website users to search for, obtain quotes for, and purchase insurance products.

185. Plaintiffs' and the Class Members' payments to Defendant for insurance services were for household and personal purposes.

186. Defendant used unfair and deceptive acts or practices in the conduct of trade or commerce, in violation of 815 Ill. Comp. Stat. § 505/2, including but not limited to the following:

      a. Defendant encouraged consumers to use its website while representing their commitment to protecting visitors' privacy and removing advertising

cookies. Meanwhile, Defendant shared and enabled the interception of Plaintiffs' and Class Members' Private Information by Third Parties without Plaintiffs or Class members' knowledge or consent.

b. Defendant promised it would not share Plaintiffs' and Class Members' information with third parties for the purpose of advertising. Nevertheless, Defendant enabled and encouraged Third Parties to intercept Plaintiff's and Class Members' information for the purpose of marketing and targeted advertising.

c. Plaintiffs and Class Members relied on Defendant's representations in using Defendant's website and thought they were communicating only with their trusted insurance provider. In actuality, Defendant surreptitiously intercepted and enabled the interception of Plaintiffs' and Class Member's communications by Adobe, Google, Youtube, and Pinterest, among others.

187. Defendant's disclosure of Plaintiffs' and Class Members' Disclosed Information was willful, knowing, and done with intent that Plaintiffs and Class Members rely upon the concealment, suppression or omission of a material fact: that Defendant were tracking Plaintiff's and Class Members' Disclosed Information, using it for advertising purposes without their permission, and disclosing that information to unauthorized third parties who also used it for advertising purposes.

188. Had Plaintiffs and Class Members been aware that their Disclosed Information would be transmitted to unauthorized third parties, they would not have entered transactions with Defendant and would not have provided payment or their personal information to Defendant.

189.    The Illinois Personal Information Protection Act ("IPIPA"), 815 Ill. Comp. Stat. §
530/20, provides that a violation of that statute constitutes an unlawful practice under the CFDPA.

190.    Defendant is a "data collector" under IPIPA. 815 Ill. Comp. Stat. § 530/5.

191.    As a data collector, Defendant owns or licenses information concerning Plaintiffs
and the Illinois subclass, who are Illinois residents.

192.    The IPIPA requires a data collector that "maintains or stores . . . records that contain
personal information concerning an Illinois resident shall implement and maintain reasonable
security measures to protect those records from unauthorized access, acquisition, destruction, use,
modification, or disclosure." 815 Ill. Comp. Stat. § 530/45(a).

193.    IPIPA's rights are not subject to waiver. 815 Ill. Comp. Stat. § 530/15.

194.    The IPIPA further requires that data collectors "notify the resident at no charge that
there has been a breach of the security of the system data following discovery or notification of
the breach. The disclosure notification shall be made in the most expedient time possible and
without unreasonable delay, consistent with any measures necessary to determine the scope of the
breach and restore the reasonable integrity, security, and confidentiality of the data system." 815
Ill. Comp. Stat. § 530/10(a).

195.    As alleged above, Defendant violated the IPIPA by failing to implement and
maintain reasonable security measures to protect Plaintiffs' and Illinois Subclass Members'
personal information. Defendant further violated the IPIPA by failing to give Plaintiffs and Illinois
Subclass Members expedient notice without unreasonable delay.

196.    The CFDPA provides that "[a]ny person who suffers actual damage as a result of a
violation of this Act committed by any other person may bring an action against such person. The
court, in its discretion may award actual economic damages or any other relief which the court

deems proper." 815 Ill. Comp. Stat. Ann. 505/10a(a). Further, "the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." *Id*. at 505/10a(b).

197.     As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the CFDPA, Plaintiff and Class Members have suffered damages for which Defendant is liable, including, but not limited to:

    a.   Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private.

    b.   Defendant eroded the essential confidential nature of the insurer-insured relationship.

    c.   Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value.

    d.   Plaintiffs and Class Members did not get the full value of the insurance services for which they paid, which included Defendant's promise and duty to maintain confidentiality.

    e.   Defendant's actions diminished the value of Plaintiffs' and Class Members' personal information.

    f.   Defendant's actions subjected plaintiffs' and Class Members to risk of harm resulting from the use and disclosure of Plaintiff's assets, name, location, interest in insurance, and other Disclosed Information.

198.    Plaintiffs and Class Members seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the Court. Had Plaintiffs and Class Members been aware that their Disclosed Information would be transmitted to unauthorized third parties, they would not have entered into such transactions and would not have provided payment or personal information to Defendant.

199.    As redress for Defendant's repeated and ongoing violations, Plaintiffs and Class Members are entitled to, *inter alia*, actual damages, reasonable attorneys' fees and costs, and injunctive relief.

### COUNT V
### CALIFORNIA INVASION OF PRIVACY ACT
### CAL. PEN. CODE § 631
### (on behalf of Plaintiffs Johnson and Chiu and the California Subclass)

200.    Plaintiffs re-allege and incorporate paragraphs 1 through 135 as if fully set forth herein. The California Legislature enacted the California Invasion of Privacy Act, Cal. Pen. Code §§ 630, et seq. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." Id.

201.    Cal. Pen. Code § 631 prohibits the following conduct by a defendant, if done "by means of any machine, instrument, contrivance, or in any other manner":

202.    "Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line,

cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or

203.    "Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state," or

204.    "Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or

205.    "Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

206.    Defendant engaged in all four of the above-listed forms of prohibited conduct.

207.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email as well. *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

208.    Defendant's website and the tracking technologies Defendant intentionally installed on it are prohibited, as they constitute a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

209.     Through its use of cookies and tracking technology, Defendant used a recording device to record the confidential communications in transit, including Disclosed Information, without the consent of Plaintiffs or Class members, and transmitted such information to Third Parties.

210.     Defendant aided, agreed, and conspired with Third Parties to secretly record, use, intercept, and transmit the Disclosed Information.

211.     The relevant intercepting devices include, but are not limited to:

    a.  The computers and servers to which Plaintiffs' and Class members' communications and information were disclosed;

    b.  Plaintiffs' and Class members' personal computing devices;

    c.  Plaintiffs' and Class members' web browsers;

    d.  Plaintiffs' and Class members' browser-managed files;

    e.  Cookies;

    f.  Other pixels, trackers, and/or tracking technology installed on Defendant's website and/or server, or on Plaintiffs' and Class members' browsers;

    g.  Defendant's computer servers;

    h.  Third Party source code used by Defendant; and

    i.  Third Party computer servers.

212.     The relevant trackers and cookies transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiffs' and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

213. Defendant willingly facilitated the Third Parties' interception and collection of Plaintiffs' and Class Members' communications or Disclosed Information, and the Third Parties' use of their communications or Disclosed Information, by embedding the trackers and cookies on its website. Moreover, Defendant had full control over these trackers and cookies, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

214. Defendant gave substantial assistance to Third Parties in violating the privacy rights of Defendant's website users, even though Defendant's conduct constituted a breach of the duties that it owed, including the duty financial institutions owe to their customers. Defendant knew that the installation of the trackers and cookies on its website would result in the unauthorized disclosure of website users' communications to Third Parties.

215. Defendant assisted Third Parties in reading, learning, and exploiting the Disclosed Information. Defendant disclosed details about website users to Third Parties, as described above.

216. Plaintiffs and the Class members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT VI**
**CALIFORNIA INVASION OF PRIVACY ACT**
**CAL PEN. CODE § 632**
**(on behalf of Plaintiffs Johnson and Chiu and the California Subclass)**

217. Plaintiffs re-allege and incorporate paragraphs 1 through 135 as if fully set forth herein. CIPA § 632(a) prohibits "intentionally and without the consent of all parties to a

confidential communication, us[ing a] recording device to eavesdrop upon or record the confidential communication."

218.    By installing cookies and trackers despite Class members' explicit instructions not to, Defendant used a recording device to record confidential communications, including the Disclosed Information described above.

219.    Defendant also aided and assisted Third Parties to eavesdrop in violation of § 632 by facilitating, permitting, and endorsing their use of trackers and cookies to surreptitiously record and read communications between Class members and Defendant.

220.    The recording devices used by Defendant include, but are not limited to, the devices described in Count V above.

221.    Plaintiffs and the Class members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief. Plaintiffs and Class members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT VII**
**CALIFORNIA INVASION OF PRIVACY ACT**
**CAL. PEN. CODE § 638.51 ET SEQ.**
**(on behalf of Plaintiffs Johnson and Chiu and the California Subclass)**

222.    Plaintiffs re-allege and incorporate paragraphs 1 through 135 as if fully set forth herein.

223.    CIPA § 638.51 prohibits the installation or use of "a pen register or trap and trace device without first obtaining a court order." Cal. Penal Code § 638.51(a).

224.    Defendant repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order and without any valid consent from users. Defendant's continued

use of Trackers after a user declined consent demonstrates that no valid consent was obtained. Instead, Defendant relied on a deceptive interface that falsely conveyed user control while continuing to intercept and transmit private communications.

225. An "electronic communication" is defined as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system[.]" Cal. Penal Code § 629.51(a)(2).

226. All communications between individual Plaintiffs or Class members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

227. California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

228. Trackers and cookies are "pen registers" under § 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of visitors to Defendant's website. Cal. Penal Code § 638.50(b).

229. California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

230.    The Trackers are also "trap and trace devices" under CIPA § 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Penal Code § 638.50(c).

231.    Defendant installed the Trackers on its website and used them to capture and transmit addressing information, including Plaintiffs' and Class Members' IP addresses, pages visited, unique cookies, and other addressing information to Third Parties.

232.    Plaintiffs and Class Members did not provide their consent prior to Defendant's installation and use of the trackers and cookies. On information and belief, Defendant also did not obtain a court order to install or use the trackers and cookies.

233.    Under California Penal Code § 637.2, Plaintiffs and Class members have been injured by Defendant's violations of California Penal Code § 638.51(a), and each seek statutory damages of $5,000 per violation.

234.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT VIII
### CALIFORNIA UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE § 17200 ET SEQ.
### (on behalf of Plaintiffs Johnson and Chiu and the California Subclass)

235.    Plaintiffs re-allege and incorporate paragraphs 1 through 135 as if fully set forth herein. The California Business and Professions Code §§ 17200, et seq. prohibits acts of unfair competition, which includes unlawful business practices.

236.    Defendant's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et. seq. (the "UCL") because, as alleged above, Defendant violated California common law, and other statutes and causes of action alleged herein.

237. When using Defendant's website and services, Plaintiffs and Class Members relied on Defendant's status as a trusted financial institution and the representations in its cookie banner and privacy policy.

238. Inconsistent with its representations and role, Defendant disclosed Plaintiffs' and Class Members' Disclosed Information to Third Parties without their consent. Thus, Defendant represented that its services had characteristics, uses, or benefits that they do not have and represented that its services were of a particular standard, quality, or grade when they were not, in violation of Cal. Civil Code § 1770.

239. Had Plaintiffs and Class members known that Defendant would assist Third Parties in intercepting, collecting, and transmitting their Disclosed Information, Plaintiffs and the Class Members would not have used Defendant's services.

240. Plaintiffs and Class members have a property interest in their communications and other Disclosed Information. By surreptitiously collecting, disclosing, and enabling the interception of Plaintiffs' and Class Members' Disclosed Information, Defendant has taken property from Plaintiffs and Class Members without providing just (or indeed any) compensation.

241. By deceptively collecting, using, and sharing Plaintiffs' and Class Members' Disclosed Information with Third Parties for Third Party use, Defendant has taken money or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of himself and the Class.

242. Defendant's business acts and practices also meet the unfairness prong of the UCL according to all three theories of unfairness.

243. Plaintiffs and Class members have lost money and property due to Defendant's conduct in violation of the UCL. Plaintiffs' and Class members' Disclosed Information has

monetary value. Companies are willing to pay for such Disclosed Information, like the information Defendant unlawfully collected, transmitted to Third Parties, and enabled Third Parties to intercept.

244.    By deceptively collecting, using, intercepting, and sharing Plaintiffs' and Class Members' communications or Disclosed Information with Third Parties, and by allowing Third Parties to intercept and use their Disclosed Information, Defendant has taken money and/or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of himself and the Class.

245.    As a direct and proximate result of Defendant's unfair and unlawful methods and practices of competition, Plaintiffs and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Disclosed Information.

246.    As a direct and proximate result of its unfair and unlawful business practices, Defendant has each been unjustly enriched and should be required to make restitution to Plaintiffs and Class members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## COUNT IX
## BREACH OF CONTRACT
### (on behalf of Plaintiffs and the Class)

247.    Plaintiffs re-allege and incorporate paragraphs 1 through 135 as if fully set forth herein.

248.    Defendant's representations to Plaintiffs and Class Members regarding its use of cookies and tracking technology, including the representations in its cookie banner, constitute a contract. By declining consent via Defendant's cookie banner, Plaintiffs and the Class members

70

indicated their acceptance of Defendant's offer not to employ advertising cookie and tracking technologies while they navigated Defendant's website. In consideration for Defendant's promise, Plaintiffs and the Class Members continued to use Defendant's website and products, in reliance on the representations Defendant made in its cookie banner.

249.     Plaintiffs and Class members would not have provided their personal information to Defendant, including Disclosed Information, or would have paid less for Defendant's services, in the absence of the contract binding them and Defendant. Defendant's promised safeguarding of the Disclosed Information was critical to realize the intent of the parties.

250.     As detailed above, Defendant breached its contracts with Plaintiffs and Class Members by enabling and assisting Third Parties in intercepting their Disclosed Information.

251.     As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members sustained actual losses and damages as described in detail above.

## PRAYER FOR RELIEF

252.     **WHEREFORE**, Plaintiffs, individually and on behalf of all other similarly situated, request judgment in their favor and the following relief:

a.   For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representative and Plaintiffs' counsel as Class Counsel;

b.   For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

c.   For an award of punitive damages, as allowable by law;

d.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of

Plaintiffs' and Class members' Disclosed Information and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class members;

e. For an Order declaring the rights and obligations of the parties, including, without limitation, that Defendant owes a legal duty to its customers and website users to secure their Disclosed Information and that Defendant violates this legal duty by disclosing its website visitors' Disclosed Information to unaffiliated Third Parties;

f. For equitable relief compelling Defendant to adopt appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Disclosed Information compromised and unlawfully disclosed to Third Parties;

g. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

h. For an Order compelling Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

i. For an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law;

j. Costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

k. Pre- and post-judgment interest on any amounts awarded; and

l. Such other and further relief as this court may deem just and proper.

253. Plaintiffs demand a trial by jury on all issues so triable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.


Date: February 23, 2026                    Respectfully submitted,

By: */s/ Samuel J. Strauss*
Samuel J. Strauss (SBN: 6340331)
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com

*Attorney for Plaintiff and Proposed Class*